HADLOCK, Bank Com'r, et al., v. BENJAMIN
DRAINAGE DIST. et al.

No. 5375.   Decided January 31, 1936.   (53 P. [2d] 1156).

Rehearing denied October 15, 1936.

*Robinson & Robinson,* of Provo, for appellants.

*A. B. Morgan,* of Provo, and *O. P. Soule,* of Salt Lake City, for respondents.

EPHRAIM HANSON, Justice.

This action was brought by the plaintiffs to quiet their title to certain lands in Utah county. Plaintiffs assert title by reason of a tax deed from Utah county. The defendants claim a lien on the premises by reason of unpaid drainage taxes. The trial court found for the defendants, and to reverse that decree plaintiffs appeal. Briefly stated, the facts with which we are here concerned are as follows: In the year 1919, Payson Exchange Savings Bank loaned to Frank A. Peay and wife, of Payson, $5,000; to secure payment of the loan, Peay and wife gave to the bank a mortgage on certain lands in Utah county, Utah, in which mortgage they agreed to pay all taxes and assessments levied against the land. The land was within Benjamin drainage district and subject to drainage taxes.

The state and county taxes for the years 1922, 1923, 1924, and 1926 were not paid. Drainage taxes for these same years and also for the years 1927 and 1928 were levied and assessed against the land, but remained unpaid. In 1927 the county auditor of Utah county duly sold the land to the county for the state and county taxes and accrued costs for the year 1922, and issued to the county the regular auditor's tax deed for the same.

Prior to August, 1928, the bank became insolvent and was taken over by the bank commissioner of the state of Utah. On August 14, 1928, Peay and wife by quitclaim deed conveyed all of their right, title, and interest in and to the lands to the bank commissioner for the benefit of the bank, and duly received a release of mortgage acknowledging that the giving of the quitclaim deed was payment in full of said mortgage. This release of mortgage was filed for record in September, 1928.

In July, 1929, Utah county, for and in consideration of the sum of $215, by quitclaim deed conveyed all of its right, title, and interest in and to the land in question to the plaintiffs. Plaintiffs take the position that the deed from Utah

county to them created a new title and that by virtue of it the lien of the drainage district for taxes was erased. The defendants assert that the giving of the deed from Utah county to the plaintiffs did not create a new title in the plaintiffs; that the payment to the county of the consideration expressed in the deed was no more than the payment of the taxes by the plaintiffs, who were at that time the owners and in possession of the premises; and that the lien of the drainage district for the taxes due it was not affected by the transaction between the county and the plaintiffs.

The position taken by the defendants is correct. We are concerned more with the substance of the transaction than its form. The so-called purchase by the plaintiffs from Utah county was no more than the payment of the taxes in a round-about way. In form, it was a sale. In reality, it was the payment of the taxes and nothing more. Plaintiffs, by thus in form only purchasing the property, did not acquire any right or title to it different from that which they had before. The purchase by them made their title no better, no stronger. That one who is under a duty to pay taxes cannot add to or strengthen his title by purchasing the land at tax sale is established as settled law. *Winter* v. *City Council of Montgomery*, 101 Ala. 649, 14 So. 659; *Christy* v. *Fisher*, 58 Cal. 256; *Newmyer* v. *Tax Service Corp.*, 87 Colo. 474, 289 P. 365; *Hurt* v. *Schneider*, 61 Colo. 104, 156 P. 600, L. R. A. 1916F, 204; *Griffin* v. *Turner*, 75 Iowa, 250, 39 N. W. 294; *National Surety Co.* v. *Walker*, 148 Iowa, 157, 125 N. W. 338, 38 L. R. A. (N. S.) 333; *Purl* v. *Purl*, 107 Kan. 314, 191 P. 297; *Gibson* v. *Hornung*, 110 Kan. 211, 203 P. 730; *Cooley* v. *Waterman*, 16 Mich. 366; *Toliver* v. *Stephenson*, 83 Neb. 747, 120 N. W. 450; *Brooks* v. *Garner*, 20 Okl. 236, 94 P. 694, 97 P. 995; *Burgess* v. *Peth*, 79 Wash. 298, 140 P. 351; *Callihan* v. *Russell*, 66 W. Va. 524, 66 S. E. 695, 26 L. R. A. (N. S.) 1176; *Lamborn* v. *Board of Dickinson County Com'rs*, 97 U. S. 181, 24 L. Ed. 926; *Foley* v. *Kirk*, 33 N. J. Eq. 170.

There are especially strong reasons why in this case plaintiffs should not be permitted to set up their tax title and defeat the tax lien of the defendants. Drainage districts were organized under the laws of the state. Taxes were levied and assessed in practically the same manner as general state and county taxes. The statute created a lien upon the land for the unpaid drainage taxes. The only source of revenue to drainage districts is by the collection of the taxes upon the land lying and embraced within them. These drainage districts could not successfully succeed if the drainage taxes remained unpaid. To permit the owner, who had failed to pay the taxes levied and assessed against his property, to become the purchaser at a tax sale for state and county taxes, and thus wipe out the lien created for and in behalf of the drainage district, would destroy the very purpose of the drainage district acts. An inducement to refrain from paying his taxes would be held out to each landowner within the district. ·

Plaintiffs cite and apparently rely upon the decision of this court in *Robinson* v. *Hanson,* 75 Utah 30, 282 P. 782. The sole question in that case was whether the lien for general taxes was paramount and superior to the lien for taxes or assessments levied by a drainage district, and we held that upon public policy and necessity, taxes for general governmental purposes were paramount to all other demands against the taxpayer, including the taxes levied by the drainage district. In that case, the purchaser of the land for the unpaid state and county taxes was a stranger to the title and was under no obligation to pay them. An entirely different question is presented here. There are other questions presented, but as this one is determinative of the rights of the parties we need not at this time pass upon them.

The judgment and decree of the trial court, holding that the lien of the defendants for the unpaid drainage taxes still existed, is affirmed; respondents to recover their costs.

MOFFAT, Justice.

I concur. I also concur in what the CHIEF JUSTICE says in his concurring opinion.

ELIAS HANSEN, Chief Justice (concurring).

There is no controversy in this case as to the facts. Some of the facts are stipulated; others are established by documentary evidence. They are as follows: The defendant Benjamin drainage district was organized in May, 1918, for drainage purposes pursuant to the laws of Utah. Drainage benefits were assessed and equalized against the 27.01 acres of land involved in this controversy in the sum of $100 per acre, or the total sum of $2,701. During the years from 1918 to 1931, both years inclusive, defendant drainage district expended $133,000, or approximately $29 per acre, on the lands within the district in constructing and maintaining a drainage system for the purpose of benefiting the property within the district. During each of the years 1922 to 1930, both years inclusive, the drainage district levied assessments on the lands therein, including the lands in controversy. The taxes and assessments so levied were not paid during such years, except as will presently appear. On December 18, 1919, Francis A. Peay and his wife, Rena Hone Peay, executed a mortgage for $5,000 in favor of the Payson Exchange & Savings Bank. On March 15, 1927, an auditor's tax deed was issued to Utah county, Utah, because the state, county, school, road, and bounty taxes levied for the year 1922 had not been paid. On August 14, 1928, Francis A. Peay and Rena Hone Peay, his wife, conveyed to the trustee of the Payson Exchange & Savings Bank the lands in question. The conveyance was by quitclaim deed which recited that the consideration was in payment of a note for $5,000 dated December 18, 1919, and that the "deed is given subject to all delinquent taxes, water assessments and drainage taxes on above described property." As a party of the transaction whereby Peay and his wife conveyed the land in ques-

tion to the trustee of the Payson Exchange & Savings Bank, the bank in turn released the mortgage which the Peays had given to the bank to secure the $5,000 note. Pursuant to a resolution of the board of county commissioners of Utah county, approved July 1, 1929, the county clerk of Utah county, acting for and on behalf of such county, executed the so-called quitclaim deed whereby the county quitclaimed all its interest in the land in question to the Payson Exchange & Savings Bank and released the auditor's deed by which the land was conveyed to the county. The consideration paid by the bank for the deed was $215.75, which was the amount of state, county, school, road, and bounty taxes levied against the premises conveyed during the years 1922, 1923, 1924, and 1926. The consideration paid did not include the penalties and interest on the taxes levied against the premises.

Upon the foregoing facts, appellants contend that they are entitled to the land in controversy free from any and all liens of the drainage district for assessments or taxes levied against such land. On the contrary, the drainage district contends that the land is subject to its lien for all drainage assessments which have been levied against such land. While the parties have discussed a number of minor matters, in the final analysis that is the sole question which divides the parties to this litigation. Counsel in their respective briefs have argued at some length the question of whether or not the plaintiffs have established the regularity of the proceedings pursuant to which Utah county issued its tax deed to the Payson Exchange & Savings Bank. For the purpose of this case it may be assumed that such proceedings were in all respects in conformity with law. Considerable is also said in the briefs of counsel with respect to the duty or lack of duty of the Payson Exchange & Savings Bank to pay the drainage assessments levied against the land covered by its mortgage. At the time the bank received the quitclaim deed from Utah county it was not a mortgagee of the land in question but was the owner of a defeasible equity of redemption thereof. Such equity of redemption was inferior and

subject to the claims of the county and the drainage district for taxes and assessments. At the time the bank paid the taxes and received the quitclaim deed, there was in effect a statute which provided that, "The board of county commissioners may, at any time after the period of redemption has expired * * * permit a redemption from any sale where the property has been sold to the county." Laws Utah 1921, chap. 140, p. 384, now R. S. Utah 1933, 80-10-68. The county is by this provision permitted, if not required, to recognize an outstanding equity notwithstanding an auditor's tax deed has issued to the county. Thus the bank, being the sole owner of the outstanding equity, was entitled to redeem the property from the tax sale even though the time for redemption had expired. The only other outstanding claim against the premises, so far as is made to appear, other than that of the county, was the lien of the drainage district for its assessments. Therefore, the only one who could redeem, other than the drainage district, was the bank. When the Peays quitclaimed to the bank they parted with their right to redeem. The right of the bank to redeem was not founded upon the fact that it had formerly held a mortgage on the premises because that mortgage had been released. Its right to redeem was based upon the fact that it held a defeasible equity in the property subject to the claim of the county and the drainage district. It had such right by reason of the quitclaim deed from the Peays.

As will be seen from the cases cited in the prevailing opinion, one who owes a duty to pay taxes cannot strengthen his title by purchasing a title at a tax sale. Appellants recognize that rule as being sound law, but contend that no such duty rested upon the bank at the time it received the quitclaim deed from the county. That the bank was not personally liable for the payment of the taxes and assessments is clear. The same was true with respect to the Peays, who owned the land when the taxes and assessments were levied. The Peays having conveyed the land to the bank subject to the taxes and assessments, they were under no duty, legal or otherwise, to pay the taxes and assessments. Unless that

duty entirely ceased to exist, it passed to the bank when it accepted the conveyance of the land subject to the taxes and assessments.

Upon principle, I can see no basis for distinguishing between the position of the Peays with respect to their duty to pay the taxes and assessments during the time they were the owners of the land, and the duty owing by the bank during the time it was a mortgagee as well as after it accepted a conveyance of the premises. The cases generally hold that a mere purchase from the owner of premises, after levy of taxes thereon and sale thereof, imposes no obligation on such purchaser to pay the taxes and assessments which were levied prior to the time of purchase, and hence such a purchaser may strengthen his title by a tax deed. Among the cases so holding are *Lybrand* v. *Haney*, 31 Wis. 230, and *Oswald* v. *Wolf*, 129 Ill. 200, 21 N. E. 839. These cases and others of similar import deal with controversies between private individuals. The case in hand affects a public or quasi public interest. While drainage assessments are inferior to general taxes, none the less the former are impressed with a public interest. All of the landowners within the drainage district are affected whenever any land therein. escapes the payment of its just proportion of the obligations of the district. A drainage district is not concerned with the relative rights of owners, mortgagees, tenants, etc., in and to the various tracts of land therein. Such notice as it takes of ownership is for the purpose of making assessments and for the information of the parties concerned. The drainage district, like the state and other taxing agencies, levies a tax or assessment upon every possible interest in the lands within the taxing unit. All parties who have an interest in the lands are equally obligated to pay drainage taxes, the same as they are under obligation to pay general taxes. The sole penalty for failure to pay such taxes and assessments is a forfeiture or sale of all rights. Contractual obligations may determine the relative rights of those who own interests in the lands within a drainage district as to who shall pay the taxes and assessments, but as all interests

are equally obligated to pay taxes and assessments, such contractual obligations are of no concern to the district. As thus viewed, the Payson Exchange & Savings Bank by reason of its mortgage was under the same obligation, so far as the drainage district is concerned, to pay the taxes during the years 1922, 1923, 1924, and 1926, as it would have been under had it owned the property during such years, and hence, as to the district, its title was not aided by the quitclaim deed from the county. Such are, in effect, the views expressed by the learned author of 3 Cooley on Taxation (4th Ed.) p. 2856. Moreover, it would seem that the county commissioners of Utah county in authorizing the execution of the quitclaim deed to the Payson Exchange & Savings Bank intended that the same should be effective merely as a redemption. The resolution of the county commissioners authorizing the conveyance provided that the "County Commissioners hereby authorize the County Auditor to issue a quitclaim deed to the Payson Exchange & Savings Bank and release the taxes on sale No. 1248 in the name of Francis A. Peay. Delinquent taxes for the years 1922, 1923, 1924 and 1926. The consideration of this sale is $218.65 which includes the cost of the quitclaim deed and the recording thereof. This sale is made for the best interest of Utah County and in complying with sections 6054 and 6056 of Compiled Laws of Utah 1917." It will be noted that the quitclaim deed was to "release the taxes," not to convey the title held by the county. The consideration to be paid was the amount of the delinquent taxes for the years mentioned together with the fees for making out the deed and the recording thereof, without any interest or penalty charges.

It is the duty of the county commissioners to assist in the collection of drainage assessments as well as general taxes. There can be no doubt upon this record but that the property in question could have been readily sold for ample to pay all taxes and assessments which were outstanding at the time of the so-called "sale." It is difficult to believe that the county commissioners were so forgetful of their duties

to the Benjamin drainage district as to intend to sell the tract of land to the Payson Exchange & Savings Bank for a fractional part of its value to the exclusion of the lien of the drainage district. Indeed it is, to say the least, very doubtful, if the county commissioners had had any such intentions, that their action in such respect could be sustained. Much may be said in favor of the view that such action on the part of the commissioners would constitute, as a matter of law, fraud upon the drainage district. The quitclaim deed was executed, not by the county auditor as directed by the county commissioners, but by the county clerk. Just what effect such fact would have upon the validity of the quitclaim deed, if the transaction is to be regarded as an attempted sale rather than as a redemption, is not, in the view I take, necessary to decide.

The quitclaim deed which the county gave to the bank is also open to the construction that it was intended as a mere release of general taxes. In one part of the deed it is recited that Utah county quitclaims the property to the Payson Exchange & Savings Bank. In another part it is recited that it "is given in pursuance to any order made by the board of county commissioners on the 1st day of July, 1929, and for a *release* of that certain tax deed bearing date of March 15, 1927." The latter expression tends to show that the quitclaim deed was intended as a release or redemption rather than a sale.

For these reasons, in addition to those expressed in the prevailing opinion, I concur in the affirmance of the judgment appealed from.

FOLLAND, Justice (dissenting).

The prevailing opinion decides that a mortgagee who purchases a county's title after auditor's deed has been issued to the county after tax sale is merely a redemptioner and not a purchaser of the title. The question of the construction and validity of the county's deed to the bank is not decided, but it is held that a deed from the county in any

form conveying its interest to one who was a mortgagee of the property is merely a redemption and not a conveyance of title. I doubt the correctness of this view. In the recent case of *Hanson* v. *Burris*, 86 Utah 424, 439; 46 P. (2d) 400, 407, this court, speaking through Mr. Justice Moffat, stated:

"The purchaser from the county (not a redemptioner) takes title free and clear of liens, otherwise the county would be hampered in collection of taxes and prevented from again having the property returned to the assessment rolls."

And again speaking of a mortgage holder:

"If he then permits the redemption period to expire and the title to become vested in the county or a purchaser after the redemption period expired, his mortgage lien is extinguished, although the contract and debt obligation between the mortgagor and mortgagee may still subsist. The same principle applies to special assessment liens for local municipal improvements. The same principle must of necessity apply to drainage tax assessments or liens."

In that case it was held that the plaintiff, a stranger to the title, obtained by purchase of the county's tax deed a new title by independent grant from the sovereign authority cleansed of all prior tax liens and incumbrances.

The question here resolves itself to whether, under the facts of this case, the bank by obtaining the county's deed by purchase thereby became a purchaser or a redemptioner. If it was a redemptioner merely, the prevailing opinion is right; but if it was a purchaser, then a different result would follow. I am inclined to the belief, under the statutes of this state, that the status of the bank was that of a purchaser, and as such, when it took title from the county, it obtained a complete title to the land free and clear of all liens.

The statute, R. S. Utah 1933, 80-10-36, provides that after sale to the county and before time for redemption "the county treasurer is authorized and required, at private sale, at his office, to sell and assign the interest of the county in any of the real estate sold to the county for delinquent taxes

to any person holding a recorded mortgage or other lien against such real estate, upon payment of the amount of the delinquent taxes, interest, penalty and costs thereon." This particular provision was written into the law in 1919 by amendment to Comp. Laws Utah 1917, § 6023, by chapter 122, Laws of Utah 1919, and accompanied the change in the method of sale whereby sales for taxes were made only to the county and to the exclusion of private bidders. By R. S. Utah 1933, 80-10-66, the assignee of a certificate of sale, if the property had not been redeemed within the four-year period, was entitled to demand and obtain an auditor's deed conveying the property to such assignee, his heirs or assigns, on presentation and delivery of the certificate of sale. These sections of the statute would seem to be authority for the proposition that the holder of a recorded mortgage may become a purchaser of the title of the county. If such mortgagee can become a purchaser prior to passing of auditor's deed to the county, there is no reason why he cannot do so after auditor's deed has been issued. The right is not less after the period of redemption has expired and auditor's deed has passed. The only difference indicated by statute between a mortgagee and a stranger purchasing from the county is that the mortgagee may purchase before the period of redemption has expired while a stranger may not purchase until after auditor's deed has been issued to the county and the property has been advertised and offered for sale at the May sale. R. S. Utah 1933, 80-10-68, as amended by chapter 62, Laws Utah 1933, p. 111. There is no specific statutory expression nor any implication arising from statutory language to the effect that a mortgagee is in any worse position than a stranger in acquiring title from the county. Indeed, the express provision granting to a mortgagee the right to purchase at any time after sale and before redemption would seem to mitigate in his favor rather than against him, and to give preference over a mere stranger or the mortgagor; neither of whom being given by statute the right to purchase title from the county prior to

redemption. The mortgagee having been granted the right to purchase the mortgaged property after sale and before period of redemption has expired and to take title of the county and other taxing units, he should be held to have the right as a purchaser to take title after period of redemption has expired and the auditor's deed has issued to the county thereby extinguishing all claims and encumbrances. The title so obtained is, if he be regarded as a purchaser, the whole title of the county and the several taxing units. It is not a mere redemption of the property from delinquent taxes. Unless this be the meaning and effect of the provisions of the statute above cited authorizing the county treasurer to sell and assign the county's interest to a mortgagee or lienholder of record, such provision has no meaning or effect whatsoever. Under other provisions of the statute a mortgagee or other person interested has a right to redeem within the same time and subject to the same terms and conditions as the owner. R. S. Utah 1933, 80-10-59, as amended by Laws Utah 1933, chap. 61, p. 111. That the legislative intent was to confer a privilege on the mortgagee or lienholder of record different from, and in addition to, the right of redemption by anyone interested is further indicated in the last mentioned section wherein it is provided that the redemption may be made, by any person interested, from a sale to the county where the county's interest has been assigned to some mortgagee or lienholder pursuant to R. S. Utah 1933, 80-10-36.

It will be noted that the tax sale to the county of the property involved was of date January 6, 1923. The four-year period of redemption expired January 6, 1927, and auditor's deed was issued to the county March 15, 1927. Under the provisions of Comp. Laws Utah 1917, § 6056, as amended by Laws Utah 1921, p. 384, c. 140, any person interested had the right to redeem within the four-year redemption period, and a further privilege of redemption by permission of the board of county commissioners at least up to the time of the May sale. The auditor's deed, if the

proceedings were regular, vested title in the county and, as we have already held, created a new title free and clear of liens. The title of the former owner was thereby extinguished and cut off subject only to the limited right of redemption heretofore mentioned. On August 14, 1928, about one and one-half years after the vesting of title in the county, the bank obtained from Peay and his wife their quitclaim deed to the property. No title passed by this deed since title was then vested in the county. At best only a possible right or equity of redemption was conveyed. The deed from the county to the bank of date July 1, 1929, conveyed all the right, title, and interest of the county, and the various taxing units represented by it in the tax sale, to the grantee. The ambiguous language in the deed with reference to the release of taxes seems to me to be surplusage. There is no evidence in the record that the bank was in possession of the property at any time. A possible inference might arise that it took possession after obtaining Peay's deed August 14, 1928, but the bank was at no time under any contractual or other duty to the mortgagor or to the drainage district to pay any of the taxes for which the property was sold. The following statement of the law from 26 R. C. L. p. 414, is therefore applicable here:

"The mere fact that the purchaser at a tax sale had at the time the tax was assessed an estate or interest in the land sold or an incumbrance upon it does not prevent him from acquiring a new and paramount title to the property to the exclusion of those having other estates or interests therein, if he was under no obligation to pay the taxes for which the property was sold."

It is my view that the bank was under no infirmity when it acquired the deed from the county, and by such conveyance it became vested with the new title freed from all liens, that its status was that of a purchaser and one at least on an equality with a stranger who might at that time have purchased the property from the county. It no longer bore any relation to the title as a mortgagee, since

its lien had been cut off by the sale and conveyance to the county.

The prevailing opinion may express a sound public policy, but it seems to me to run counter to the statute.

WOLFE, Justice (dissenting).

I dissent. I think that the quitclaim deed from Utah county erased the lien of the drainage district for taxes in favor of the insolvent bank. The bank is not in the same position as the former owner of the land who owed the taxes. It was the mortgagee. It certainly should have the same rights as any other person not connected with the former title. The reason that an owner who has the duty to pay taxes cannot assert that he is a new owner after purchase from the county as against lienholders or others interested in the property is because of the rule of estoppel. Any one who purchases from the county obtains in law a new title, in effect emanating from the sovereign free from liens; but a former owner who has failed to pay the taxes is estopped from asserting it as against a mortgagee or other lienholder because it was his duty to protect such mortgagee or lienholder by payment of the taxes. The court, in effect, says, you are a purchaser like any one else, and not a redemptioner, but we will not permit you to assert your new title from the county in order to defeat the rights of a mortgagee whom you agreed to protect. In estoppel will be found the solvent of such situations. The same rule applies where a junior mortgagee seeks to obtain title as against a prior mortgagee. Where there are two or more mortgagees, there is community of interest. When any of them or the owner purchases from the county, it will be considered to be in support or protection of the property which is a lien for all of the mortgagees. While there is not privity, there is a community of lienholders arising from their respective contracts with the owner. It may well be in such case that a junior or other mortgagee who bought in the title would be estopped from asserting that he did not do so to protect the property for lien pur-

poses. *Riley* v. *Bank of Commerce of Roswell*, 37 N. M. 338, 23 P. (2d) 362. Especially is this true of a cotenant. *Columbia Trust Company* v. *Nielson*, 76 Utah 129, 287 P. 926. But in the instant case the drainage district had no lien on the property derived by contract from the owner. It was not in any sense one of community of lienholders, each under duty to protect the property for lien purposes and each by estoppel to be prevented from asserting that it had not bought in the property to save it for lien purposes or for the benefit of the entire community of lienholders who derived their liens from the owner. In this case the drainage district was in the same position as one asserting a title paramount to the mortgagor. It was under no obligation to refrain from doing any act which would dispel the lien. In fact, if it had sold for failure to pay the drainage taxes, it was in the same position in that regard as the county—it could dispel the liens of all the contract lienholders. If there are no mortgages or other liens, or others interested in the property whose interests the owner is under duty to protect, then, of course, the owner who buys the title is in exactly the same position as if a stranger had purchased it because the taxing units get their taxes and he recovers his land as a new purchaser without being subject to estoppel. The true legal view is to consider always the purchaser from the county as obtaining the new title clear of liens, but in proper cases, where necessary to do justice, invoke the principle of estoppel. The mortgagee in this case, however, was not in a position where it should be estopped. It is in the position of a stranger to the title when he purchases it from the county. It was not its duty to pay the taxes. It could have paid them to prevent the lien from being erased, but it had no duty to do so. In this case the mortgagee, who sought to obtain the land which was a security for his debt through a purchase from the county, is put in a worse position than a stranger who would buy in the land for the taxes but who had had no indebtedness against the property. The fact that the bank commissioner took a quitclaim deed from Peay and his wife, the former owners, of all their

right, title, and interest before buying in the title from the county, would seem to me to make no difference. By taking the quitclaim deed they simply obtained any interest or right of redemption which the Peays owned, if there was one, but they did not by the quitclaim deed succeed to the Peays' obligation and duty to pay the tax. Quitclaim deeds do not transfer obligations, but only rights, if there are any. This is not saying that the taker of a quitclaim deed may not take subject to the rights of others.

I think the plaintiff, when he took a quitclaim deed from the county, took the land free from drainage taxes, and that he would have so taken it regardless of whether he obtained a quitclaim deed from the Peays or not. The mere fact that out of an abundance of caution he obtained a quitclaim deed from the former owners in order to gather in any possible interest they might have left in themselves, whether before or after he obtained the deed from the county, makes no difference. The mortgagee is in the position of a stranger as far as his ability is concerned to purchase from the county land on which he had had a mortgage and which has passed to auditor's deed. Certainly, because he happens to have lost a lien which he had for an indebtedness, he should not be, because of the property passing to auditor's deed, put in any worse position than he would be if he were a mere stranger who never had that protection for a debt. If the owner and mortgagee should conspire to permit the land to go to tax deed so as to clear it of drainage tax liens, that is, if the mortgagee should not act in good faith, the principle of estoppel would apply as in the case of an owner. Many situations in the law are susceptible of abuse by wrong-minded persons, but that cannot militate against the laying down of principles which are designed to prevent inequities and injustice. The law takes care of those who pervert principles designed to protect rights by still other principles designed to circumvent the perversions.

Since writing the above, the CHIEF JUSTICE has written a concurring opinion which attempts to uphold the decision contained in that opinion on grounds which I think

are at least as untenable as those contained in the prevailing opinion. I am constrained to comment thereon. The chronology of events is as follows: March 15, 1927, auditor's deed to the county; August 14, 1928, quitclaim deed from the Peays to Payson Bank; July 1, 1929, deed from county to Payson Bank. The concurring opinion says:

"At the time the bank received the quitclaim deed from Utah County it was not a mortgagee of the land in question but was the owner of a defeasible equity of redemption thereof. Such equity of redemption was inferior and subject to the claims of the county and the drainage district for taxes and assessments."

In the case of *Hanson* v. *Burris*, supra, we held that a sale of land to the county for taxes clears off all liens. It even eliminates the lien for general taxes just as a sale on foreclosure of the mortgage eliminates the mortgage lien. A purchaser from the county takes his title from a new source—the county. The very basis of that decision rests on the conception that the county on auditor's deed obtained title to the property free from liens. The main opinion in this case stated that the tax liens were "merged" in the title. The concurring opinion holds that the lien was gone or "cleaned off." I prefer the latter conception, because I think it inaccurate and a misconception of the nature of a mortgage lien to speak of it as merging in a title. A title in the last analysis is simply a bundle of rights in reference to the thing to which you have title—the right to enjoy and dispose of it. A lien is simply a right to resort to the property for the collection of a debt if not paid. The latter right does not "merge" in the rights symbolized by title any more than a horse that dies in harness merges into the carriage it was pulling. The rights of lien simply disappear. They are sloughed off. The right to resort to the property no longer exists. It is cleaned off as an encumbrance against the property and not merged into the bundle of rights we call a title. It does not become part of such rights. But be that as it may, the Hanson Case was definitely founded on the conception that the owing taxpayer's title was transferred by

the auditor's deed to the county free of liens. The county had the title which it could convey by the so-called May sale or thereafter. The former owner had a right to redeem. All former lienholders including the drainage district also had rights to redeem. And as stated in the concurring opinion a purchaser or transferee of the owner's right of redemption would have a right to redeem. But would he not also have the right to buy outright the county's title free from any liens? It is admitted that a person who never had any relationship to the title could buy at the so-called May sale and afterward the title which the county possessed which is a title free from liens including the drainage district lien. If it should happen that such stranger to the title should have taken a quitclaim deed from the owner after the owner's title was gone, thus stepping in the owner's shoes in possessing the right of redemption (if there was in the owner a right of redemption), could it be said that such purchaser was in any worse position as far as his ability to buy the county's title free of liens was concerned than before he bought such right of redemption—that he had by such purchase put himself out of the class who could buy the county's title free of drainage district liens? I think not. He, unlike the owner, would not be estopped from asserting as against the drainage district that he bought free from liens. An owner who lost his title by tax deed may purchase from the county. He gets title from the county clear of encumbrances. He must if the property goes to the county clear of liens. Mortgage liens and other liens are not suddenly reinstated on property from which they were wiped off by auditor's sale just because the former owner purchases from the county. The reason the owner buying from the county cannot assert a clear title against his mortgagee is because of estoppel. The title is clear of the mortgage lien, but in an action to foreclose he is estopped from asserting that it is. No other theory will square with the other conceptions and legal phenomena involved. In this case there was nothing which required the principle of es-

toppel to be invoked against the mortgagee in favor of the drainage district.

I have serious doubts whether the bank at the time it took a quitclaim deed from the Peays in 1928 obtained a right of redemption because the owner's right had ceased. Comp. Laws Utah 1917, § 6024, in force in 1928 provides that a redemption may be accomplished any time within four years after the sale. After that time the right ceased. Laws Utah 1921, chap. 140, provided that "the board of county commissioners *may*, at any time after the period of redemption *has expired* and before the sale as herein provided [the May sale], *permit* a redemption from any sale where the property has been sold to the county." Note will be taken that it was only permissive and that the statute recognized that the period of redemption had expired. In the 1933 Revision, section 80-10-68, it is provided that the county commissioners *"shall*, at any time after the period of redemption *has expired* and before the sale as herein provided, permit a redemption from any sale where the property has been sold to the county." Here again is recognized the conception that the period of redemption has expired, but it is made obligatory on the county commissioners to permit the owner to save his property as long as it still lies within the power of the commissioners. But in 1928 the right of redemption had expired. For these reasons I think the concurring opinion in error when it states that the owner in 1928 still had an equity of redemption. Consequently the bank obtained no right of redemption from the owner. The transaction between the bank and the county in 1929 was therefore a transaction of sale and purchase and not one of redemption regardless of the recitals of the quitclaim deed from the county to the bank. Furthermore, for the reasons above stated and as given in Mr. Justice FOLLAND'S dissenting opinion, the mortgagee, even if he had a right of redemption after the four-year period, must be considered as exercising not the right of redemption but the fuller right to purchase.

The concurring opinion speaks of the duty of the bank to

pay taxes in place of the Peays, who it says no longer had the duty after quitclaiming to the bank. I am not ready to subscribe to the principle that an owner shifts his liability for taxes by conveying his property. Moreover, section 80-10-1, R. S. Utah 1933, provides that "every tax has the effect of a judgment against the *person.*" Thus there is foundation for the conception that it is a personal obligation as well as a charge against property. But it is not necessary at this time to decide whether a tax assessed is a debt of the owner personally, measured in amount by the value of his assessed property and a lien thereon, or whether it is merely a charge against that property. The true view is that the inability of an owner to claim a title through the county as against his former mortgagee does not depend at all on his duty to the county to pay taxes. The county, in effect, has received its taxes when it receives the property by auditor's deed. The reason why the owner cannot assert a tax title free of the lien of his mortgages against such mortgagee is because it would be unfair to permit it. He contracted to pay the taxes and in respect to the mortgagee he has the duty to do so—a contractual duty. He cannot by a roundabout way profit by his failure to perform that duty. The law will treat his purchase as if it were subject to the mortgage because he is estopped from asserting as against the mortgagee that it is not so subject to the mortgage. But while the owner has this contractual duty toward the mortgagee to protect the lien of said mortgagee, the mortgagee has neither a contractual nor other duty to pay the drainage district taxes. There is nothing more inequitable about permitting the mortgagee to purchase from the county free of all liens than there is in permitting a stranger never before in any way connected with the title to do so. In fact, it is equitable to permit the mortgagee to do so, for he has lost his lien by the sale to the county.

The opinion under consideration states:

"All parties who have an interest in the lands are equally obligated to pay drainage taxes."

I cannot agree that a mortgagee has an interest ·in the land in that sense. To my mind the citation from Mr. Cooley's work on taxation does not bear out the statement that a mortgagee has such an interest as to be under the same obligation as the owner to pay drainage district taxes. The mortgagee has a right to resort to the land mortgaged as a resource for the payment of his debt in case it is not paid when due, but that is a right to subject it to sale for payment of his debt but not an interest in the land. Moreover, as stated above, by auditor's deed to the county he no longer had even such a right or, if you please, such an interest. Therefore, even under the reasoning of that opinion he was not a person with an interest who was "equally obligated to pay drainage taxes."

I am presenting my views in respect of the opinion of the CHIEF JUSTICE because I desire to have it known that as far as I am concerned the statements made therein are not foreclosed from further inquiry as to their validity whenever they may arise in future cases.