R. Earl DILLMAN and Lejeune Dillman, his wife, Plaintiffs and Appellants,

v.

Herbert E. FOSTER, and Frances M. Foster, his wife, George E. Mangan and Kathryn M. Mangan, his wife, and Omni Winterton and H. Carma Winterton, his wife, Defendants and Respondents.

No. 17457.

Supreme Court of Utah.

Oct. 26, 1982.

Brant H. Wall, Salt Lake City, for plaintiffs and appellants.

Gayle F. McKeachnie, Clark B. Allred, Vernal, for defendants and respondents.

DURHAM, Justice:

The plaintiffs in this case appeal from an adverse judgment in their action to quiet title to some real property described as Lots 2 and 3, Block 4, Pick-up Addition in the city of Roosevelt. Earl and Lejeune Dillman ("plaintiffs") filed suit in 1978 against Herbert and Frances Foster, George and Kathryn Mangan, and Omni and Carma Winterton. On May 2, 1980, a pretrial order was filed in which the parties stipulated that since the initiation of the suit, the

Fosters and Wintertons had quitclaimed any interest in the property to the Mangans ("defendants"). The Fosters and Wintertons were dismissed as defendants and the matter was tried to the court on June 30, 1980.

In its Findings of Fact, the trial court stated that the real property in question, two undeveloped lots in a Roosevelt City subdivision, was acquired by the plaintiffs prior to January 1, 1964, and that the plaintiffs were the record titleholders on that date. As record titleholders, the plaintiffs were assessed by Duchesne County for property taxes pursuant to U.C.A., 1953, § 59–5–4, but failed to make payment. In February of 1964, the plaintiffs conveyed the subject property, Lots 2 and 3, together with other real property, to Richfield Enterprises, Inc., who conveyed title to Roosevelt City Development Company. In January of 1965, all of the property was conveyed back to the plaintiffs. In February of 1967, the plaintiffs conveyed the subject property together with the other property to National Title Insurance Company. Almost immediately, National Title conveyed all of the property to Herbert and Frances Foster, the predecessors in interest to the claims of the defendants. In the meantime, due to the plaintiffs' failure to pay the 1964 property taxes, Lots 2 and 3 were sold at a preliminary tax sale to Duchesne County in May of 1965. Following that sale, neither the plaintiffs nor any of the subsequent titleholders paid the 1964 taxes, so the property was subject to a final or auditor's tax sale in May of 1969. At that sale, the plaintiffs appeared and, by paying the delinquent 1964 taxes, obtained an auditor's tax deed.

The record shows that at least twice during the years following the 1969 tax sale, the Fosters, residents of California, attempted to pay the taxes on the subject property. However, each time, plaintiff Earl Dillman, a former Duchesne County Attorney, discovered this payment, and instructed the Duchesne County Treasurer to return the check to the sender and to accept his payment instead. As a result, the Duchesne County Treasurer's records indicate that the plaintiffs paid the taxes on the property from 1970 through 1979.

The plaintiffs claim that the subject property was mistakenly included in the 1964 conveyance to Richfield Enterprises, Inc. The record shows that essentially the same description was used in all of the transfers in which this property was included from 1963 through 1967. The trial court found that at least as early as 1971, the plaintiffs claimed a mistake had been made, but that there was no evidence of any mistake. The plaintiffs claim that a Release and Agreement, executed in July of 1976 between the Fosters, Plastronics Corporation (successors in interest to National Title Insurance Co.) and American Title Company, is evidence of the claimed mistake. The Release and Agreement provide, *inter alia,* for the transfer of title to certain other lots from Plastronics to the Fosters. These other lots had been transferred earlier by the plaintiffs to Plastronics at its request. The plaintiffs now assert that these lots were actually transferred in exchange for a release to the plaintiffs of the subject property, allegedly conveyed by mistake, as an accord and satisfaction. However, whatever the purpose of the Release and Agreement among its participants (which purpose was apparently relevant to Plastronics' exposure to liability as a title insurer), the trial court found that the Release and Agreement specifically preserved the Fosters' claim to the subject property by stating:

> Fosters claim all legal right, title and interest in Lots 2 and 3, Block 4, of Pick-up Addition, Section 2, and have done so, mindful of various conveyances and acknowledged that their success or failure to retain title to said lots will in no way effect [sic] this settlement, and that this settlement shall in no way effect [sic] the Fosters' legal claim to said lots.

The record also shows that in 1971 the defendants purchased a lot adjacent to the subject property. The defendants wished to pasture some animals on Lots 2 and 3 and asked the plaintiff Earl Dillman if he

would sell his interest in the property. Defendant George Mangan had discovered conflicting claims to Lots 2 and 3 and specifically mentioned the Foster claim to the plaintiff Earl Dillman. The plaintiff Earl Dillman refused to sell but said he had no objection to the defendants' use of the property. The defendant George Mangan also contacted the Fosters in California and obtained their permission to use the lot for pasture. Subsequently, the defendants began to use the property by pasturing animals, constructing a fence, irrigating and clearing the land.

The plaintiffs allege three errors in their appeal. In their first point, they assert that the trial court erred by failing to sustain the validity of their auditor's tax deed. The trial court found that the plaintiffs had an obligation to pay the 1964 taxes, that they had failed to pay these taxes, that the tax sale had occurred because of that failure, and that the plaintiffs could not "use their failure to discharge their legal obligation as a basis to acquire title as against the interest of ... other record titleholders." The trial court cited U.C.A., 1953, § 59–5–4, which in part provides:

> The County Assessor must, before the fifteenth day of April of each year, ascertain the names of all taxable inhabitants and all property in the county subject to taxation ... and must assess such property to the person by whom it was owned or claimed, or in whose possession or control it was at 12:00 m. of the first day of January next preceding, and at its value on that date ....

The plaintiffs argue that the statute merely sets out the manner in which taxes are to be assessed but does not impose a duty on the owner to pay the taxes. This argument is contrary to public policy and good sense. The collection of taxes for the common welfare would be hindered if it were the duty of the county treasurer to collect taxes from someone other than the individual to whom the property was assessed pursuant to § 59–5–4. Chapter 10 of Title 59, entitled "Collection of Taxes," places no obligation on the county treasurer to investigate or trace possible title transfers subsequent to January first. That official's duties, in relevant part, are specified in § 59–10–10:

> On receipt of the assessment roll the county treasurer shall index ... the names of all property owners shown by the assessment roll .... He shall proceed to collect taxes and shall furnish to each taxpayer ... a notice of the amount of tax assessed against him ....

It is true that anyone could pay the tax, but if the January 1 record holder transfers his interest in the property and does not want to be held liable for the tax, it is his obligation to make appropriate arrangements for payment by his transferee:

> Public policy requires that all taxes be paid promptly where due, and it is the duty of every citizen to pay the taxes properly assessed against his property.... [H]e cannot escape liability for the consequences of delinquency upon the ground of his good faith in belief of his own nonliability for the tax.

72 Am.Jur.2d *State and Local Taxation* § 834 (1974).

In *San Juan County v. Jen, Inc.,* 16 Utah 2d 394, 401 P.2d 952 (1965), this Court held that the tax upon real property is a charge upon the property and is not in the nature of an *in personam* obligation of the owner, *i.e.,* the recourse is to the property and not to the owner. It is important to note that this holding was made in the context of the county's attempt to pursue a landowner personally when the assessed tax remained unsatisfied after the land had been sold for taxes. That case considered § 59–10–1, holding that the landowner's obligation was limited by the value of the land taxed, and that "the effect of a judgment against the person" was satisfied when "the taxes are paid *or* the property sold." Since the property was sold for taxes, this Court held that the judgment was satisfied according to the statute. Although there is language in the *San Juan* decision which implies that the statute creates no personal obligation of any kind, that language is not necessary to the holding and is clearly contrary to the

plain meaning of § 59–10–1. To the extent that such dicta conflicts with the statute and the holding in this case, it is expressly disavowed.

■ In § 59–10–1, the legislature has made clear its intention that the person taxed be held responsible for payment of the tax:

> Every tax has the effect of a judgment against the person, and every lien created by this title has the force and effect of an execution duly levied against all personal property of the delinquent. The judgment is not satisfied nor the lien removed until the taxes are paid or the property sold for the payment thereof.

This statutory language makes the following commentary applicable to the circumstances of this case:

> [O]ften by virtue of express statutory declarations, a property tax is considered a tax on the person of the owner of the property, assessed on him on account of his ownership, and although the tax is measured by the amount and value of the property and can be collected out of the property, it is nonetheless a tax on the owner and not on the property, and becomes a personal obligation of the owner. A personal obligation, when fixed, does not depend upon continued ownership of the property assessed . . . .

72 Am.Jur.2d *State and Local Taxes* § 836 (1974). Thus, we hold that the trial court was correct in finding that the plaintiffs, as record owners of the subject property on January 1, 1964, were obligated to pay the 1964 taxes.[1]

The plaintiffs appeared at the May, 1969 tax sale, and by the payment of $46.51, specified in the deed as "delinquent taxes, penalties, interest and costs constituting a charge against said real estate," purchased an "Auditor's Tax Deed" for the property in dispute. It is necessary to address the question of what force and effect a tax deed has when purchased under these circumstances. In *Frederiksen v. LaFleur,* Utah, 632 P.2d 827 (1981), this Court reviewed the status of tax deeds under Utah law and the policies underlying that law. In that discussion, we referred to the customary protection afforded the tax debtor by the narrow construction given to the statutes which provide for the sale of tax-delinquent lands. That policy of protection is based on the assumption that the tax debtor is the possessor of property which is probably his home or farmland. Traditionally, the tax debtor is afforded every opportunity to pay his taxes and retain his property. For that reason, courts had been willing to invalidate tax titles held by strangers for the flimsiest of technical faults. The *Frederiksen* case points out that it was to give increased stability to tax titles that in 1951 the Utah Legislature enacted §§ 78–12–5.1 through –5.3 which provide a special statute of limitations applicable to tax titles. If the conditions of the statutes are met, a tax title cannot be challenged after four years following its purchase, regardless of its original validity.

■ With these policies in mind, we must decide whether the plaintiffs' tax deed is entitled to the protection given tax titles under §§ 78–12–5.1 through –5.3. We hold that it is not. The statutes make it clear that although the legislature intended to increase the stability of tax titles, it did not wish to do so at the expense of the record titleholder without giving that titleholder reasonable time to challenge the tax sale and deed, pay his taxes and clear his title. None of these policies or provisions suggests that one who fails to pay his law-

---

1. The dissent, in discussing the actual *methods* pursued by the county treasurer in assessing and collecting taxes, gives insufficient weight to the legal obligation imposed by § 59–10–1. That statute states clearly that "every tax has the effect of a judgment against the person." Against what person should this "judgment" lie if not against the person to whom the tax was assessed? A titleholder? Any person found on the land? As this case illustrates, there may be no clear titleholder and no one possessing the land. Therefore, the county treasurer need not look into title or possession, but rather may proceed directly against the land to satisfy the tax assessment. However, this in no way mitigates the legal obligation imposed on the person assessed, as § 59–10–1 makes clear.

fully assessed taxes and then conveys away the property, ought later to be afforded the protection of the tax title statutes when he finally meets his tax obligation at a tax sale and then attempts to raise that tax deed against the successor to his own grantee. This conclusion is in accord with generally recognized law. One who is under an obligation to pay taxes on land cannot be allowed to strengthen his title to such land by buying in the tax title when the property is sold as a consequence of his omission to pay taxes. "[H]is purchase at the sale will merely operate as a payment of the taxes, and the title will be the same as it was before the sale, except that the lien for taxes is discharged." 72 Am.Jur.2d *State and Local Taxation* § 941 (1974). This rule is often applied in cases dealing with cotenants or a mortgagor and mortgagee. *See, e.g., Crofts v. Johnson,* 6 Utah 2d 350, 313 P.2d 808 (1957); *Free v. Farnworth,* 105 Utah 583, 144 P.2d 532 (1943). In the *Crofts* case, this Court stated:

> This court has recognized the generally accepted principle that one who is under a duty to pay taxes cannot shirk that duty and then take advantage of it by purchasing the land at tax sale, and that if he does so it will not strengthen his title.

*Id.* 6 Utah 2d at 353, 313 P.2d at 810. Although the circumstances of this case differ from the above, the underlying principle of disallowing a benefit to flow from a dereliction of duty remains applicable:

2. The dissenting opinion reaches the conclusion that the plaintiff's tax title is good against the defendants and their predecessors. However, this conclusion, as well as the conclusion that adverse possession by the Dillmans was successful, is premised on the assumption which we here reject, namely, that it was *possible* at all for the plaintiffs to purchase a tax title. The dissent also refers to this opinion as concluding that Dillman purchased the property "as a constructive trustee for all claimants of title acquired thereafter," but this is a misconception. Dillman made no purchase at all but rather satisfied the statutory "judgment" against him.

3. It should be noted that even if the plaintiffs had acquired a tax title, it is questionable whether their claim would be protected under the tax title statutes. Both § 78–12–5.1 and § 78–12–5.2 allow a defense against a tax title to be raised by one who has been in actual

The doctrine which denies to one under obligation to pay taxes on land the right to strengthen his own title by the acquisition of title at a tax sale arising from his own delinquency was devised for the protection of persons whose interests in the land sold would be impaired if a person neglecting his duty to pay a tax were permitted to purchase the land at the resulting tax sale.

72 Am.Jur.2d *State and Local Taxation* § 942 (1974). The plaintiffs had conveyed away all their title and interest in the subject property prior to the May, 1969 tax sale. By meeting their tax obligation at that sale, the plaintiffs could not acquire any title or interest in the property beyond that which they already held, which is to say, they acquired no interest and no title. We hold, therefore, that the plaintiffs could not and did not purchase[2] a tax title at the May, 1969 tax sale and are not entitled to the protection of the tax title statutes.[3]

In their second point on appeal, the plaintiffs claim title to the disputed property under the doctrine of adverse possession. The plaintiffs rely on their payment of taxes since the 1969 tax sale and their possession and occupation through the Mangans to establish their claim.[4] U.C.A., 1953, § 78–12–7 provides as follows:

> In every action for the recovery of real property, or the possession thereof, the

occupation or possession. The record shows that the defendants have been occupying the property since 1971. The plaintiffs assert that the defendants' use of the property was by their permission, but it seems apparent from the record that the defendants obtained permission from the record titleholders as well. Whether this occupation by permission constituted actual occupancy or possession for either the plaintiffs or the defendants' predecessors and whether the plaintiffs or defendants could benefit by such under the tax title statutes are questions we need not reach at this time.

4. Since we have already held that the plaintiffs did not acquire a tax title by their payment of taxes in 1969, it is not necessary to consider the effect of a tax title on a claim for adverse possession.

person establishing a legal title to the property shall be presumed to have been possessed thereof within the time required by law; and the occupation of the property by any other person shall be deemed to have been under and in subordination to the legal title, unless it appears that the property has been held and possessed adversely to such legal title for seven years before the commencement of the action.

Under the provisions of this statute, the defendants' predecessors, the Wintertons and the Fosters, having held legal title to the property, must be deemed to have been possessed thereof within the required period. Actual possession by the legal titleholder is not necessary. However, one who claims adversely must be able to show possession such that the legal titleholder is put on notice of his claim. See U.C.A., 1953, § 78–12–7 and annotated cases. The plaintiffs have made no assertions of personal occupation or possession of the premises. Instead, they point to the defendants' use and possession which they claim was undertaken by their permission. Since the use and possession was by their permission, the plaintiffs argue, the use and possession should accrue to them as adverse possessors under the statute. As mentioned earlier however, the defendants apparently also had the Fosters' permission to make use of the property.[5] Such ambiguous possession by representation is not sufficiently open, notorious or hostile as to give a reasonably prudent titleholder notice of the claimant's intention. See, e.g., Scott v. Hansen, 18 Utah 2d 303, 422 P.2d 525 (1966). Without notice, i.e., conduct clearly inconsistent with the rights of the titleholder, the seven-year statutory period could not begin to run. See Ash v. State, Utah, 572 P.2d 1374 (1977); Scott v. Hansen, supra. We find no error in the trial court's conclusion that the plaintiffs' claim of adverse possession has not been established. The payment of taxes, standing alone, is insufficient to support the plaintiffs' claim. U.C.A., 1953, § 78–12–12.

The plaintiffs' final point on appeal asserts error in the trial court's failure to sustain their claim to title based on equitable principles. The plaintiffs argue that the subject property was conveyed to Richfield Enterprises, Inc., by mistake in 1964. We sustain the trial court's finding that there is no evidence of any mistake. Following the conveyance to Richfield Enterprises, the property was conveyed back to the plaintiffs in 1965, who conveyed it away again in 1967. Thus, the plaintiffs had ample opportunity to inspect the language of the documents, and the knowledge necessary to ascertain their meaning. The plaintiffs assert that the Release and Agreement, described above, is evidence of the mistaken conveyance. The record makes it clear, however, that the plaintiffs were not parties to that transaction. On this basis, the trial court found no accord and satisfaction and we agree. Furthermore, as the trial court pointed out, the plaintiffs claimed a mistaken conveyance as early as 1971, but failed to take any action. Under U.C.A., 1953, § 78–12–26(3), the plaintiffs' claim of mistake has long since been barred by the running of the statute of limitation. We affirm the trial court's ruling that the plaintiffs have no equitable claim to title.

In its conclusions of law, the trial court found that the plaintiffs were entitled to judgment for the taxes they paid on the subject property since the 1969 tax sale. This ruling was apparently based on principles of unjust enrichment or implied contract, in spite of the general rule to the contrary that there can be no recovery for a voluntary payment of a debt of a third person. We assume that the plaintiffs paid the taxes by mistake and not as volunteers, and, therefore, affirm both the trial court's dismissal of the plaintiffs' claim of title to the subject property and its award of $443.91 to the plaintiffs for taxes paid since 1969.

Affirmed. No costs awarded.

STEWART and OAKS, JJ., concur.

5. Since the defendants became the legal titleholders after the initiation of this suit, the plaintiffs are in the anomalous position of claiming to have adversed the very parties through whom they assert adverse possession.

**HALL, Chief Justice (dissenting):**

I respectfully dissent for the reason that the main opinion confuses the long-established principles of law applicable to tax titles and adverse possession.

The majority of the Court concludes that plaintiff R. Earl Dillman, in purchasing the subject property at tax sale, did so as a constructive trustee for all claimants of title acquired thereafter. I deem that conclusion to be without substance or support.

The main opinion espouses a public policy in opposition to Dillman's contention of nonliability for the payment of the 1964 taxes, when the opinion states that such contention is "contrary to public policy and good sense" because "the collection of taxes for the common welfare would be hindered if it were the duty of the county treasurer to collect taxes from someone other than the individual to whom the property was assessed." This is not only *ipse dixit* but a *non sequitur*.

The majority opinion cites no authority in support of its departure from the more realistic statutorily prescribed, or permissible, procedure generally followed, which is to assess the property on or before April 15,[1] notify the owner of record of the amount of tax assessed against the property,[2] and make no specific effort to *collect* the tax assessed, but to *accept* payment of the tax from whatever source, be it from the owner, an agent, escrow, or for that matter, from a nonowner. The assertion that such a procedure hinders the collection of taxes is clearly without substance when viewed in light of the ultimate and highly effectual means of *collection* afforded by statute which provides for the sale of the property for unpaid taxes.[3]

1. Pursuant to U.C.A., 1953, § 59–5–4.

2. Pursuant to U.C.A., 1953, § 59–10–10.

3. Pursuant to U.C.A., 1953, § 78–12–51.

4. *San Juan County v. Jen, Inc.,* 16 Utah 2d 394, 401 P.2d 952 (1965); the main opinion acknowledges the holding in this case but chooses to disavow it.

The main opinion cites U.C.A., 1953, § 59–10–1 in support of its assertion that: "The legislature has made clear its intention that the person taxed be held responsible for the payment of the tax." However, this Court has heretofore held to the contrary, concluding that the legislature omitted expressing any intent that there should be a personal judgment, and further concluding that the tax upon real property is a charge upon the property, and not in the nature of an *in personam* obligation of the owner.[4]

The particular facts in this case further point up the fallacy in the thesis adopted by the main opinion. Plaintiff R. Earl Dillman was the sole owner of the property on January 1, 1964.[5] In February, 1964, prior to the time the property was assessed,[6] and also prior to the time that the 1964 taxes were levied against the property,[7] Dillman conveyed the property to Richfield Enterprises Incorporated. Therefore, during the time Dillman owned the property, he could not have paid the taxes because the amount thereof had not yet been determined. Just such a set of circumstances points up the apparent, realistic and practical reason the legislature has not seen fit to charge the various counties with the responsibility of collecting taxes on real property other than by a sale thereof should taxes be left unpaid.

I now address the two causes of action alleged in the complaint and suggest that they are sound and call for a reversal of the judgment of the trial court.

## FIRST CAUSE OF ACTION

This cause has to do with title acquired at the May sale, based on U.C.A., 1953, § 78–12–5.2, which reads as follows:

5. Notwithstanding the recitation in the main opinion that "plaintiffs" were the owners on that date.

6. U.C.A., 1953, § 59–5–4 requires assessment on or before April 15.

7. U.C.A., 1953, § 59–9–6.3 requires taxes to be levied between the last Monday in the seventh month and the second Monday in the eighth month of each fiscal year.

*No action or defense* for the recovery or possession of real property or to quiet title or determine the ownership thereof *shall be commenced or interposed against the holder of a tax title after the expiration of four years from the date of the sale,* conveyance or transfer of such tax title to any county, or directly to any other purchase thereof *at any public* or private *tax sale* and after the expiration of one year from the date of this act. Provided, however, that *this section shall not bar* any action or defense *by the owner of the legal title* to such property *where he or his predecessor has actually occupied or been in actual possession of such property within four years from the commencement or interposition* of such action or defense. [Emphasis added.]

At the time Dillman purchased the title at the 1969 May sale, he became the owner in fee, unless, as provided under the foregoing statute, "the owner of the legal title ... or his predecessor has actually occupied or been in actual possession of such property within four years from the commencement or interposition of such action or defense." There is absolutely nothing in the pleading or proof claiming compliance with or relief under the said statute.

Neither the Fosters, their predecessors, nor anyone claiming under them have claimed or offered proof of having "actually occupied" or been in "actual possession" of the property during *any* period of time. The statute, being absolute in its terms, gave Dillman title, subject only to the conditions stated therein. Anyone desiring to contest Dillman's title would have had to do so by showing occupation or possession within the critical proscribed statutory time.

The Fosters were the owners of record at the time of the May sale, but they did not appear at the sale, and there is no evidence that they ever occupied or possessed the property under statutory requirements. In fact, the record is to the contrary, showing that they were residents of California. This placed them in the category of claimants who are barred of any action or defense if they sit by and do nothing for four years. This is precisely the type of case toward which U.C.A., 1953, § 78–12–5.2 is directed, and which prompted this Court to say in *Frederiksen v. LaFleur,*[8] quoting from *Peterson v. Callister,*[9] that:

Title 78–12–5.1 ... is not unlike other statutes of limitation .... It is a statute of repose, obviously intended to lay at rest claims against tax titles which are asserted more than four years after acquisition of the tax title under statutory proceedings, and where the record owner has not had possession during that period.

The statutes cited in support of the conclusion reached in the main opinion, that the record owner on January 1 is liable for the taxes for that particular year, are incompatible with U.C.A., 1953, § 78–12–5, which is superior thereto, and mutually exclusive thereof. This statute, to which the former pertain and are subservient, deals with a different type of procedure and subject matter. Said section 78–12–5 applies to the duty of every kind of tax obligor and owner of property prior to the May sale, and affords a defense against any such claim by passage of time and absolute legislative interdiction.

The defense raised in this case that Dillman bought the property at the May sale for the benefit of Fosters, and all others claiming under them, is but a myth, and it should be adjudged that Dillman is the rightful owner.

The main opinion contains a disarming recitation of some of the facts occurring after the May sale (which could apply to this first cause of action as well as the second or "adverse possession" cause of action addressed *infra*). The statement is

8. Utah, 632 P.2d 827 (1981).

9. 6 Utah 2d 359, 313 P.2d 814 (1957); other cases in agreement: *Dye v. Miller and Viele,* Utah, 587 P.2d 139 (1978); *Kanawha v. Carbon County,* Utah, 535 P.2d 1139 (1975); *Layton v.*

*Holt,* 22 Utah 2d 138, 449 P.2d 986 (1969); *Pender v. Brown,* 11 Utah 2d 58, 354 P.2d 1066 (1960); *Hansen v. Morris,* 3 Utah 2d 310, 283 P.2d 884 (1955).

made that "at least twice ... the Fosters ... attempted to pay the taxes," but that "Earl Dillman, a former Duchesne County Attorney, discovered this payment and *instructed* the Duchesne County Treasurer [Maxine Taylor] to return the check to the sender [a firm of attorneys] and to accept his payment instead." There appears to be no such officious interference by Dillman in the record, nor the attendant implication that there was deceit or collusion on his part. Such implication is found only in defendants' brief and is restated in substance in the main opinion.

The record shows that Taylor testified and introduced communications to some California attorneys representing themselves or someone else, including the Fosters, whose claim was barred by the 1969 May sale, in which Taylor "refunded" a check on Dillman's recommendation as owner and a person, not an attorney, her action being prompted only by such considerations. She stated that she returned the check, having ascertained it to be a "double payment," duplicating an amount "paid by R. Earl Dillman."

There is no evidence whatever suggesting that Dillman, who paid all the taxes from 1961, including those due at the time of the May sale, and all of the taxes since—a period of 17 years—lulled anyone into a false sense of security to purloin property from another. There is nothing in the record that suggests conflicting interests in the property that would create a fiduciary duty Dillman owed a mortgagor, a lienholder, a judgment creditor, or even an easement holder, that would require him to hold title to the property in trust for their benefit. He owed no duty to any person claiming ownership at the time of the May sale, or their predecessors.

The main opinion has confused a statutory tax title with one based on conflicting co-existent interests. This is clearly demonstrated when it cites no case that supports invalidity of Dillman's tax title, but cites a number that are inapposite.

All of the cases cited have to do with a *fiduciary relation* existing at the time title is claimed to have been acquired, unlike the present case, where no such relationship existed. Witness the following cases cited in the main opinion:

1. *San Juan County v. Jen* [10] does not support defendants' position, since it not only lacks any fiduciary factor, but is simply a case that actually supports Dillman's cause in two respects, holding that a) a tax is not a charge against the owner, but against the property, and b) that enforcement in collecting taxes is strictly statutory. Both factors are resolved in favor of Dillman's contention, not those of the main opinion.

2. *Crofts v. Johnson* [11] simply holds that a mortgagee could not destroy a mortgagor's legal title by buying the property at a tax sale, and without foreclosing the property. It is obvious that there was a common, existing ownership with obligations and rights in the same property, nonexistent in the instant case, so that *Crofts* is not pertinent here.

3. *Free v. Farnworth* [12] is a case where one, through deception, purchased at tax sale for the purpose of wiping out a lien which at the time encumbered his title. It was a design to profit the then owner through deception by removing a legitimate encumbrance on the property, at the expense of a legitimate, then-existing lienholder. That case is not pertinent either, since the instant case does not have to do with the destruction of an existing, legitimate right that equity should preserve against one seeking to destroy it by taking advantage. Nor is there a deceit factor. In the instant case, a limitations statute effectively protects one against persons who have no legitimate claim against the property because of failure to comply with statutory proscriptions.

The additional cases cited in defendants' brief on this same point are equally inapposite:

10. *Supra*, n. 4.

11. 6 Utah 2d 350, 313 P.2d 808 (1957).

12. 105 Utah 583, 144 P.2d 532 (1943).

1. *Hadlock v. Benjamin Drainage District* [13] is a case similar to *Free v. Farnworth, supra,* where a mortgagor in a devious way purchased at a tax sale to cut off a lienholder's legitimate right, which equity would not permit. It is a case where there were two interests of equal statute existing against property. There was no question as to cutting off rights by limitation of time, as is the case here, but only a denial of rights by equity, based on absence of fair play and presence of deception.

2. *McCready v. Fredericksen* [14] is simply a case that holds that a tenant in common cannot obtain title against a fellow tenant. This case has no similarity whatever to the plaintiffs' first cause of action, which is based on section 78–12–5, the "limitations" statute, and there is no existing tenancy involved at all. It had to do with "adversing" a fellow co-tenant under an entirely different statute, section 78–12–7, and its holding was merely that the *facts* did not satisfy the requirements of that statute.

In *Dye v. Miller and Viele,* [15] this Court affirmed prior cases in point here, and in *Frederiksen v. LaFleur,* [16] we surveyed the prior May sale cases and reaffirmed the purpose of section 78–12–5 as being legislation long delayed in putting at rest titles to property in a progressively complex area of the law. Those cases are dispositive here, and demand a reversal of the trial court. By so doing, we would continue to respect the status of continued ownership and adhere to the principle of strict statutory construction in favor of the tax debtor, "except" as stated in *LaFleur, supra,* "to the extent it has been limited by statutory enactment," which is the precise situation which exists in this case.

A further assertion in the main opinion that clearly reflects that it has misconstrued not only the purpose of section 78–12–5, but its very language reads as follows:

It should be noted that even if the plaintiffs had acquired a tax title, it is questionable whether their claim would be protected under the tax title statutes. Both § 78–12–5.1 and § 78–12–5.2, U.C.A., 1953, allow a defense against a tax title to be raised by one who has been in actual occupation or possession.

The opinion then asserts that defendants had "possession" by permission of Fosters and Winterton. The only "possession" involved in this case, and referred to in the main opinion, is the "possession" of the defendants claimed in opposition to Dillman. The main opinion's contention that defendants' "possession" was "adverse" falls when it is shown in the record that defendants themselves affirmatively testified they were in possession by permission of the plaintiffs and even offered to buy the property from Dillman, who also, without dispute, testified that he refused to sell, but permitted defendants to use the property for pasture purposes, even permitting them to do some fencing for their own purposes.

## SECOND CAUSE OF ACTION

As to plaintiffs' second alleged cause of action, the basis for establishment of title in Dillman is not factually as clear as that in the first cause. Nonetheless, it is not only supported by, but is established partly on the particular undisputed facts stated above and on facts which differ from, or are not considered in the main opinion.

In the second cause, plaintiffs claim occupation and payment of taxes continuously for seven years adverse to everyone else.

The main opinion concedes that the defendants had possession by somebody's permission, which is uncontradicted, and which would in no way impede Dillman's claim of full title and possession with full claim of right for seven years. Nevertheless, the main opinion then reasons that Dillman did not comply with section 78–12–7, the seven-year adverse possession statute, because he

13. 89 Utah 94, 53 P.2d 1156 (1936).

14. 41 Utah 388, 126 P. 316 (1912).

15. *Supra,* n. 9.

16. *Supra,* n. 8.

failed to give the defendants sufficient notice of his claim of ownership. This contention is wholly inconsistent with the uncontradicted fact that Dillman, as owner, had permitted defendants to use the property, thereby clearly indicating his claim of ownership. The defendants, who claimed to have had such permissive possession, which is additional ample notice of ownership by Dillmans, also could have looked at the public record, of which they are presumed to have knowledge, and in doing so could have seen that Dillman had paid all the taxes on the property since the year 1961. The sole point of the main opinion is lack of notice of Dillman's claim of title. It is wholly unsupported by the record, which is abundantly clear to the contrary. No other claim has been pressed that would obstruct acquisition of title under section 78–12–7, and since no other facts are shown or pointed to in the record that would prove an impediment to such acquisition of title, it is suggested that Dillman has a dual root-title source for unencumbered title under sections 78–12–5 *and* 78–12–7 that compels reversal of the trial court's dismissal of plaintiffs' complaint and granting title to defendants on their counterclaim.

HOWE, J., concurs in the dissenting opinion of HALL, C.J.